**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

————————————————————— )
ELENA M. GARABIS,                                    )
                                                     )
                        Plaintiff,                   )
                                                     )
        v.                                           )        Civil Action No. 10-2150 (ABJ)
                                                     )
UNKNOWN OFFICERS OF THE                              )
METROPOLITAN POLICE,                                 )
DISTRICT OF COLUMBIA,                                )
                                                     )
                        Defendants.                  )
————————————————————— )

**MEMORANDUM OPINION**

On December 12, 2010, plaintiff Elena M. Garabis filed her initial complaint against unknown officers of the Metropolitan Police Department ("MPD") and against the District of Columbia. She brought one claim of assault and battery and two claims under 42 U.S.C. §1983, claiming excessive force and unreasonable seizure in violation of the Fourth Amendment. On June 20, 2011, the District moved to dismiss the excessive force and unreasonable seizure claims against it under Federal Rule of Civil Procedure 12(b)(6). The Court dismissed those claims without prejudice. Plaintiff then filed an amended complaint, which reasserted a section 1983 claim against the District and included claims of assault and battery, excessive force, and unreasonable seizure against both the District and the unknown officers. Now that discovery is complete, the District has filed a motion for summary judgment on all counts under Federal Rule of Civil Procedure 56 on the grounds that plaintiff has not demonstrated that she was in fact injured by the police, and that she has failed to establish the necessary link between her alleged injuries and any official policy or practice of the District. The District also seeks summary

judgment on the claims against the unnamed officers since plaintiff has failed to substitute specific individuals for those defendants.  The motion for summary judgment will be granted.

The Court does not doubt that something bad happened to plaintiff on December 18, 2009.  Plaintiff has asserted that someone slipped a drug into her drink at a party that night, and that she subsequently experienced symptoms consistent with ingestion of a "date rape" drug.  Plaintiff was also arrested that evening, after the police were summoned to the scene by civilians concerned about her apparent intoxication and her erratic and unsafe behavior.  In this case, plaintiff attributes a series of ongoing medical problems not only to the drug, but to unspecified injuries that she claims she sustained while in police custody, when she believes that among other things, she was "manhandled" and struck by a taser.

But since plaintiff cannot remember or describe what happened to her, and she has come forward with insufficient evidence to support her claims, this action must fail.  With respect to the state law claims, plaintiff cannot establish that she was harmed by any action taken by any member of the Metropolitan Police department or that any officer possessed, much less used, a taser weapon that night.  Furthermore, there was no medical evidence presented that connected any of plaintiff's current physical ailments to anything that happened to her while she was in custody or to the possible receipt of a taser charge.  And the record is devoid of the evidence needed to hold a municipality liable for a constitutional violation.  In sum, at the summary judgment stage, the onus is placed upon the party with the burden of proof to place some meat upon the bones of her claims, and this plaintiff has failed to do.

**BACKGROUND**

On December 18, 2009, plaintiff attended a holiday reception at a restaurant with several of her co-workers, where she consumed "a few drinks." Am. Compl. ¶¶ 15–16. According to plaintiff, she left the restaurant at approximately 5:00 p.m. in a sober state. *Id*. ¶ 17. But she alleges that someone caused her to ingest a "date rape" drug while she was at the event, and that she began to lose motor skills and experience memory loss within minutes of leaving the party. *Id*. ¶¶ 18–19.

The police became involved because shortly after 5:00 p.m., several concerned citizens approached Metropolitan Police Officer John Muniz in his marked cruiser. Arrest Report, Ex. A to Def.'s Mot. for Summ. J. [Dkt. # 35-1] at 2. They advised him that plaintiff was running in the street, and that they had to restrain her to prevent her from running into traffic and harming herself. *Id.*; *see also* John Muniz Dep., Ex. 4 to Pl.'s Opp. [Dkt. # 36-4] at 8:19–8:22. The citizens explained that plaintiff was "thrashing about," and they were concerned that she might fall and injure herself on the cement. Muniz Dep. at 9:4–9:6. When Officer Muniz arrived on the scene, he observed that plaintiff was staggering and unable to maintain her balance. Arrest Report at 2. He asked plaintiff for her name and address so that he could try to get her home. Muniz Dep. at 11:4–11:6. Plaintiff refused to answer the questions and refused all other offers of assistance, including medical assistance. Muniz Dep. at 11:14–11:18. Officer Muniz also noticed that plaintiff had alcohol on her breath, bloodshot eyes, and dilated pupils. Arrest Report at 2. Since plaintiff appeared to be intoxicated, uncooperative, and incapable of getting home on her own, Officer Muniz arrested her for disorderly conduct/public intoxication and transported her to the Second District at approximately 6:00 p.m. Arrest Report at 2; Am. Compl. ¶¶ 19, 21.

Officer Muniz believes that plaintiff was ultimately detained in the Fourth District, but he does not remember why she was not detained in the Second District.  Muniz Dep. at 13:14–14:2.

Officer Muniz described plaintiff as "nonviolent," and he testified that during the arrest, "there was no force used on [plaintiff]."  Am. Compl. ¶ 20; Muniz Dep. at 15:19–15:22.  He also stated that he did not recall seeing any injuries, wounds, or marks on the parts of plaintiff's body that were exposed to view.  Muniz Dep. at 10:12–10:20, 13:8–13:10, 15:14–15:22; *see also* Ex. 5 to Pl.'s Opp. [Dkt. # 36-5] at 22:6–23:14, 26:18–27:1, 27:13–29:9.  At approximately 7:00 p.m., plaintiff was transferred to a hospital for treatment for a laceration on her nose, and she was discharged to police custody roughly an hour later.  Am. Compl. ¶ 21.  The cause of the laceration was not reported.  *Id*.

Plaintiff cannot recall what happened between her departure from the reception and when she regained consciousness in a jail cell at approximately midnight, feeling excruciating and severe pain throughout her body.  Am. Compl. ¶¶ 11, 22.  She alleges that the "sudden onset of pain after memory loss is consistent with types of 'date rape' drugs, which can numb and inhibit the body's pain receptors . . . while the victim is unconscious."  *Id*. ¶ 22.  According to the complaint, an officer noticed that plaintiff's motor skills were impaired when she tried to use a phone after she regained consciousness.  *Id*. ¶ 23.  He saw that her hands were swollen and had "turned a deep red color" and determined that she required additional medical treatment.  *Id*. ¶ 23.  While plaintiff has no memory of her first visit to the hospital, she alleges in her complaint that the medical staff recognized her on her return and noted that her hands had not been injured when she was first admitted.  *Id*. ¶¶ 24–25.

Plaintiff maintains that once she was returned to her jail cell, she "experienced vivid but incomplete flashbacks" from the prior evening, including "her hand being slammed by a police

vehicle's door, lying on the ground topless and surrounded by police officers, and being aggressively manhandled." *Id*. ¶ 26.  She was released from custody the next morning, and reports that:  her "hands and fingers were now grossly swollen"; "her arms showed deep bruises consistent with the manhandling she recalled experiencing"; "her upper extremities were unresponsive and immobile"; "her chest, elbows, knees, hands, and shoulders were lacerated, swollen, and bludgeoned"; "her nose and eyes were engorged and bruised"; "her throbbing head showed multiple contusions, which shot out excruciating pain when she moved or lied down"; "her ankles were sprained and swollen"; and "bruises on her legs extended down to her feet, which throbbed with soreness. . . ."  Am. Compl. ¶¶ 28-30.  Plaintiff examined her chest because she was "experiencing intense chest and stomach pains that inhibited her breathing," and she discovered marks on her chest and upper right arm that she alleged, upon information and belief, were caused by recent taser shots and consistent with the taser devices used by the police department.  *Id.* ¶ 31.  Plaintiff sought medical treatment for her "ubiquitous pain and suffering," and she alleges that her doctor noted the injuries "appeared to have been sustained by a beating, rather than from a less nefarious cause, like a bad fall."  *Id*. ¶ 33.

Because of these alleged injuries, plaintiff states that as of December 20, 2011 she continues to experience intense pain and difficulty accomplishing daily tasks.  Am. Compl. ¶¶ 34–35.  She notes that she suffered "three months of continuous sharp shooting pains throughout her body."  *Id.* ¶ 34.  She alleged at the time of the filing of the complaint that she was still undergoing rehabilitative surgeries, procedures, and intensive drug therapy for problems ranging from an inability to sleep to "multiple disc herniations in her cervical spine" and "nerve damage in both her arms that extends all the way to her hands and fingers."  *Id.*  She reported that she had been diagnosed with severe tendonitis, bursitis, and temporomandibular joint

5

disorder, among other problems.  *Id.*  "She regularly sees specialists for drug therapies, including trigger point injections in her head, neck, arms, and shoulders[,]" and "[s]he receives spinal nerve block epidurals for rehabilitation and to transition her into a life without constant pain medication." *Id.*

Plaintiff filed this lawsuit on December 17, 2010, alleging three claims against Unknown Officers of the Metropolitan Police and the District:  assault and battery (Count I); excessive force (Count II); and unreasonable seizure (Count III).  Compl. ¶¶ 36–41.  Counts II and III against the District were dismissed due to plaintiff's failure to state a claim sufficient to hold the District liable under 42 U.S.C. § 1983 on the theory of municipal liability. Mem. Op. [Dkt. # 19] at 6.  Plaintiff then filed an amended complaint alleging four claims:  (1) a section 1983 municipal liability claim against the District for alleged violations of plaintiff's Fourth Amendment rights; (2) an assault and battery claim against all defendants; (3) an excessive force claim against all defendants; and (4) an unreasonable seizure claim against all defendants.[1]  Am. Compl. ¶¶ 36–50.  The District has moved for summary judgment on all counts against all defendants on the grounds that:  (a) plaintiff has failed to show that her injuries were caused by police officers who were acting pursuant to a District custom or policy; and (b) plaintiff has not presented any affirmative evidence to show that she incurred her injuries while in police custody. Def. District of Columbia's Mot. for Summ. J. ("Def.'s Mot.") [Dkt. # 35] at 1.

Plaintiff filed an opposition to the motion for summary judgment, attaching as exhibits: the defendant's responses to plaintiff's interrogatories, Ex. 1 [Dkt. # 36-1]; MPD general order 901.07, Ex. 2 [Dkt. # 36-2]; plaintiff's expert witness report, Ex. 3 [Dkt. # 36-3]; and excerpts

---

1       Although the headings in the amended complaint for counts II, III, and IV suggest that plaintiff is asserting those claims against only the Unknown Officers, plaintiff attempts to recover from the District for all four claims.  *See* Am. Compl. ¶¶ 37, 46, 48, 50.

from the testimony of the arresting officer, John Muniz, Exs. 4, 5, and 6 [Dkt. #s 36-4, 36-5, and 36-6]. In its responses to plaintiff's interrogatories, the District identified five other officers as having knowledge of the facts alleged in the complaint, but if they were deposed, none of that testimony has been submitted to the Court by either side. *See* Ex. 1 to Pl.'s Opp. [Dkt. # 36-1] ¶ 2.

Throughout the litigation, the District has asserted that MPD officers are not issued, and do not use, tasers or other stun-gun devices. *See e.g.*, Def. District of Columbia's Resp. and Objections to Pl.'s First Interrog. [Dkt 36-1], ¶¶ 12, 14. In its statement of undisputed facts, however, the District mentioned that the Department had two tasers in inventory that have not been approved for use. Def.'s Statement of Material Facts as to which there is no Genuine Issue ("Def.'s St. of Facts") [Dkt. # 35] ¶ 3. In light of this new information, the Court granted plaintiff an opportunity to depose a representative of the District concerning the circumstances surrounding those weapons. Minute Order (Apr. 23, 2013). The District proffered Officer Timothy Dumantt in response to the Rule 30(b)(6) notice, and plaintiff filed a supplemental opposition to the District's motion for summary judgment after taking this additional deposition. Pl.'s Supplemental Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Supplemental Opp.") [Dkt. # 43]. The District has filed its reply. Reply to Pl.'s Supplemental Opp. ("Def.'s Reply") [Dkt. # 44]. The District's fully briefed motion for summary judgment is now before the Court for decision.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the "initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is only "material" if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In assessing a party's motion, "[a]ll underlying facts and inferences are analyzed in the light most favorable to the non-moving party." *N.S. ex rel. Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010), citing *Anderson*, 477 U.S. at 247.

## ANALYSIS

**I.      Count I:  Municipal Liability Claim Under Section 1983**

A.  Legal Standard

Section 1983 provides that "[any] person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983 (2006). To establish that a municipality is liable under section 1983, a plaintiff must prove both (1) "a predicate constitutional violation" and (2) "that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *Collins*

*v. Harker Heights*, 503 U.S. 115, 124 (1992); *see also Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691, 694 (1978).  Indeed, the policy or custom must be "the moving force behind the constitutional violation."  *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986), quoting *Monell*, 436 U.S. at 694; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) (requiring an affirmative link between the city's policy and the alleged constitutional violation).

A municipality cannot be liable for the unconstitutional conduct of its employees based simply on a theory of *respondeat superior* or vicarious liability.  *Monell*, 436 U.S. at 693; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Pembaur v. City of Cincinnati,* 475 U.S 469, 479 (1986) ("[W]hile Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*.").  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  *Pembaur*, 475 U.S at 479.  This requirement flows directly from the statute itself.

B.  <u>Even if plaintiff could establish that D.C. police officers violated her Fourth Amendment rights, her section 1983 claim still fails because she has not demonstrated that the District's custom or policy caused those violations.</u>

Plaintiff seeks to hold the District liable under section 1983 on the grounds that the District's "reckless and grossly negligent TASER policy" and deliberate indifference to the Department's TASER use caused violations of her constitutional rights.  Am. Compl. ¶ 38. Specifically, she argues that the District's policy of "arming officers with TASER weapons" without providing training or written guidelines on appropriate taser use amounted to deliberate indifference to the violation of her Fourth Amendment rights.  Am. Compl. ¶¶ 38–40.

A city can be liable under section 1983 for inadequately training its employees. *Harris*, 489 U.S. at 388. But "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91. Rather, the plaintiff must demonstrate that the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. Deliberate indifference is measured by an objective standard: the Court must consider whether the municipality knew or should have known of the risk of constitutional violations. *Baker*, 326 F.3d at 1307.

The District acknowledges that it does not provide specific training or written guidelines on the use of tasers or other stun-gun like devices. Def.'s St. of Facts ¶ 6. But it maintains that this poses no risk of any constitutional deprivation because its officers are prohibited from using the devices in the first placae. Def.'s Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") [Dkt. # 35] at 6. Plaintiff disputes this assertion. She points out that MPD General Orders plainly permit officers to use "Less-Than-Lethal Weapons," which are defined as "any object or device deployed with the intent or purpose of eliminating a threat without causing death." Pl.'s Supplemental Opp. at 7, citing GO-RAR-901.07(III)(G); *see also* GO-RAR-901.07(V)(B)(1)(d), Ex. 2 to Pl.'s Opp. [Dkt. #36-2]. She asserts that MPD issued tasers or stun-gun like devices to its officers in the past, and that it has never since promulgated an order specifically prohibiting their use. Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp.") [Dkt. # 36] at 9; Pl.'s Supplemental Opp. at 7. So, according to plaintiff, in the absence of an explicit prohibition, officers who had previously received tasers would not have known that they were no longer permitted to use them, and they continued to use them without proper training or guidelines. Pl.'s Opp. at 10; Pl.'s Supplemental Opp. at 7. But plaintiff has been given an

opportunity to discover the facts, and she has not amassed the evidence to support this contention or to refute the material supplied by the District in support of its motion.[2]

MPD General Order 901.07 provides: "No member of the Metropolitan Police Department, in the normal exercise of his or her responsibilities, shall carry, use or discharge any firearm or other weapon, except those issued or approved for use by the Metropolitan Police Department under direction of the Chief of Police." GO-RAR-901.07(IV)(D); *see also* GO-RAR-901.07(V)(F)(2) ("Under no circumstances shall a member carry or use . . . unauthorized weapons."). Thus, GO-RAR-901.07(IV)(D) is an express limit on the officers' ability to use *any* firearms or non-lethal weapons: they may only use those weapons that have been issued to them or approved for use.

To address plaintiff's allegations about taser use in this case, the District supplied the Declaration of Michael Anzallo, an Assistant Chief of the Metropolitan Police Department. He averred without equivocation that "[t]he Department prohibits the use of TASERs or stun-gun like devices by its officers in the course of duty." Anzallo Decl., Ex. 2 to Def.'s Mot. [Dkt. # 35-2] ¶ 4. He explained that while the Department's Emergency Response Team ("ERT") did have two Tasers in its inventory that had not yet been approved for use, "[t]he Department does not otherwise issue Tasers or stun-gun like devices or approve them for use." *Id.* ¶ 5. According to Assistant Chief Anzallo, since members of the MPD are prohibited from using or carrying any weapon that has not been issued or approved for use, the use of a taser is prohibited. *Id.* ¶ 6-7. Finally, he swore that the same policies would have governed the use of tasers in December 2009, when plaintiff was in police custody. *Id.* ¶ 9. In other words, since MPD did not issue tasers or stun-gun like devices to any of its officers or approve their use in 2009, when plaintiff

---

2       Moreover, there is simply no evidence establishing the availability of a taser – for use by either a trained or an untrained officer – at the site of plaintiff's arrest or detention.

was in custody, District policy memorialized in GO-RAR-901.07(IV)(D) explicitly prohibited D.C. police officers from deploying them at that time.

In the 30(b)(6) deposition convened to address the two tasers in the Emergency Response Team inventory, an officer of that unit, Officer Timothy Dumantt, explained that the ERT serves as the District's Special Weapons and Tactics (SWAT) team:  it is responsible for dignitary protection, presidential details, barricades involving hostage situations, suicide attempts, high-risk warrants, and other tasks assigned to it by the Chief of Police.  Dumantt Dep., Ex. 1 to Pl.'s Supplemental Opp. [Dkt. #43-1] at 5:16–6:2.  Officer Dumantt testified that "well over ten years ago," MPD did issue some tasers to members of the ERT.  *Id.* at 20:14–21:2.[3]  But, as of 2006 when Officer Dumantt joined the team, ERT was no longer using tasers or any sort of stun-gun like device.  *Id.* at 41:4–:17.[4]  Dumannt testified that he was specifically informed when he went through the ERT training and was issued his equipment that tasers had been taken out of service for years.  *See id.* at 44:12–44:14.  He stated that in light of GO-RAR-901.07(IV)(D), it was unnecessary for MPD to promulgate a separate policy banning the use of tasers because D.C. police officers knew that "[i]f it's not issued to you and it's not within our use-of-force policy, you cannot carry it, nor can you use it.  Plain and simple."  *Id.* at 41:22-43:9; *see also id.* at 41:10–41:17 (stating that in 2009, members of the ERT and all other D.C. police officers knew that using a taser or a stun-gun would be against the Department's policy).

---

3       During this same period, MPD did not issue tasers to officers outside of the ERT.  *See* Dumantt Dep. at 37:5–37:16 (stating that "[a]t that time, still back then, ERT was the only one that were carrying the Taser. . . . we didn't carry them as patrol officers).  So officers outside of ERT have always been prohibited from using tasers under GO-RAR-901.07(IV)(D).

4       The ERT currently has two tasers in their inventory.  Anzallo Decl., Ex. 2 to Def.'s Mot. for Summ. J.[Dkt. # 35-2] ¶ 4-5.  But these tasers were acquired in 2012, more than two years after plaintiff's detention.  Dumantt Dep. at 41:18–41:21.

Plaintiff has not produced any evidence to indicate that tasers were in fact issued or approved for use at the time and place of her detention.  Thus, she has not come forward with any evidence that would give rise to a genuine dispute about whether there was an official policy banning the use of tasers by MPD officers at the time. And she has not sought to demonstrate or argue that customary practice within the Department varied in some way from its written policy. Indeed, even plaintiff's own expert opined that the use of a taser by a D.C. police officer in 2009 would have been against Department policy.  *See* Expert Witness Rule-26 Report, Ex. 3 to Pl.'s Opp. ("Expert Report") [Dkt. # 36-3] at 10 (Opinion 4).[5]

The cases that plaintiff cites to support her assertion that the District's failure to train or provide guidelines to police officers on taser use amounted to deliberate indifference are inapposite because they all involve a municipality's alleged failure to train officers to use weapons that were issued to them and approved for use.  *See Hardeman v. Clark*, 593 F. Supp. 1285, 1286 (D.D.C. 1984) (finding that the plaintiff stated a section 1983 claim where he alleged that his injuries were caused by the District's failure to provide adequate supervision or training regarding the use of weapons that had been issued to police officers); *Larson v. Wind*, 536 F. Supp. 108, 111 (N.D. Ill. 1982) (denying defendant's motion for summary judgment on the grounds that a jury could find that the municipality's failure to train its police officers on the use

---

5      Plaintiff also argues that MPD must permit the use of tasers because "TASERs are ubiquitous in law enforcement."  Pl.'s Opp. at 9.  Even if this is true, it does not give rise to a genuine dispute of fact on the question of whether in 2009, this District issued tasers to its officers or approved them for use.

of the firearms issued to them constituted deliberate indifference to the deprivation of the plaintiff's constitutional rights).[6]

Plaintiff has failed to designate specific facts to raise a genuine dispute as to whether the District "arm[ed] officers with TASER weapons."  Since the District prohibited its officers from using tasers or stun-gun like devices, it had no reason to know that failing to provide training or specific guidelines on the use of the devices placed the constitutional rights of civilians, including plaintiff, at risk.  *See Baker*, 326 F.3d at 1307.  Therefore, this failure did not constitute "deliberate indifference to the rights of persons with whom the police come into contact," *see Harris*, 489 U.S. at 390–91, and the District is entitled to judgment as a matter of law on Count I.

## II.     Counts II, III, and IV against the Unknown Officers and the District

"It is understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."  *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.C.C. 2003).  In its motion for summary judgment, the District asserted that no reasonable jury could find for plaintiff on her common law claims in Counts II, III, and IV.  Def.'s Mem. at 7–8.  Since plaintiff's opposition failed to address this argument, the Court will treat Counts II, III, and IV as conceded, and it could grant summary judgment to defendants on that basis alone.  But even if these counts had not been conceded, they would still fail on the merits.

---

6      Plaintiff asserts that her case is similar to *Nicholson v. Williams*, 203 F. Supp. 2d 153 (E.D.N.Y. 2002).  Pl.'s Opp. at 11; Pl.'s Supplemental Opp. at 10.  But her description of the case suggests that she is actually referring to *McLain v. Milligan*, 847 F. Supp. 970 (D. Me. 1994) and not *Nicholson*.  *See* Pl.'s Opp. at 11.  In *McLain*, the court denied the defendants' motion for summary judgment where the plaintiff alleged that his injuries were caused by the municipality's failure to provide training on the use of force; the municipality's only instruction on the use of force was an optional video tape and a written policy.  847 F. Supp. at 979–80.  But the District's use of force policy is considerably more specific.

A.      Count II:  Assault and battery claim against the District

In Count II, plaintiff alleges that "Unknown Officer(s) of the Metropolitan Police Department and the District of Columbia, assaulted the Plaintiff and committed battery on the Plaintiff."  Am. Compl. ¶ 46.  In the District of Columbia, an assault is "an intentional and unlawful attempt or threat, either by words or by acts, to do physical harm to the victim."  *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007).  A battery is "an intentional act that causes a harmful or offensive bodily contact."  *Id.*  "Under the doctrine of respondeat superior the District of Columbia is liable for the torts of its police officers acting under the scope of their employment."  *District of Columbia v. White*, 442 A.2d 159, 162 n.7 (D.C. 1982); *see also Evans-Reid*, 930 A.2d at 937 ("The District is vicariously liable for the intentional and negligent acts of its officers acting within the scope of their employment.").

Causation is an essential element of both causes of action:  to sustain a claim for assault and battery, the plaintiff must establish that the defendant's intentional acts caused the harmful or offensive bodily contact or the imminent apprehension of such contact.  *Fenwick v. United States*, Civ. A. No. 07-8330, 2013 WL 772882, -- F. Supp. 2d -- at *13 (D.D.C. Mar. 1, 2013); *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 92 (D.D.C. 2010).  Plaintiff's assault and battery claim fails because she has presented no facts demonstrating that her injuries were caused by D.C. police officers.

When asked to describe what had taken place, plaintiff could only offer memories and a set of vague impressions:

> Q:  Okay.  So what did you do once you go home and noticed the marks?
>
> A:  Oh, I was just –
>
> Q:  Take your time.

A:  Thanks.  You know, just at that -- when I saw them and I started really remembering -- I just sort of have, like, this overall -- you know, just pieces and recollections and things that immediately flashed through my mind.

Q:  Okay.

A:  When I was taking the shirt off and I saw the -- they were so deep red and I was like, oh, they're bleeding.  I remember sort of this -- someone else, you know, pulling my shirt off, someone else, you know, standing over me, you know, someone holding me down, really, really bright lights in my face, people touching me in that area

Q:  Okay.

A:  You know, pressure on my chest.  Just flooded sort of with all of these pieces of, like -- and just feeling panicked.

Q:  Okay.

A:  You know, seeing those -- and I -- at that time, I wasn't really thinking of what they were.

Q:  Okay.

A:  I was just remembering more of the feelings of that area of my body being touched.

* * *

Q:  Okay. Just so I have it all in one place, tell me everything that you remember about the people you remember assaulting you.

A: I definitely remember and know that they seemed to be stronger than me, bigger than me.  They were definitely male . . . .  I know there were multiple.

Q: Okay. And tell me what, if anything, you remember about where this happened.

A: I just remember it was in a – some sort of room.  I actually – I guess I need clarification on the question because you're implying that it happened in one place.

Q: Okay.  So any of the places where you thought.

A: So, I mean, I definitely remember being – something outside of a vehicle . . . around a vehicle.  Again, the door slamming of a car . . . on the hands.  I guess I know indoors.  There is definitely recollection of indoors, very bright lights and very sort of, you know, bare floors.

Pl.'s Dep., Ex. C to Def.'s Mot. [Dkt. # 35-3] at 176:21–178:3; *see also* Pl.'s Opp. at 6–7, citing Pl.'s Dep. at 95:22–97:7.

Notably absent from this deposition testimony is a recollection of any police officer actually inflicting or threatening harm.  Plaintiff indicates that the events she vaguely recalls did not transpire at the same time or at the same place.  Her memories and impressions include being outside or around a vehicle, and that mental image is equally consistent with the period of time when concerned citizens were struggling to keep her out of traffic and under control before and while they summoned the police.  Plaintiff remembers being surrounded by males but she does not specify that they were male police officers.  *See* Pl.'s Dep. at 177:2–177:7.  She has some memory of the slamming of a car door on her hands, but she does not state that it was a police vehicle, that a police officer slammed the door, or that if such an event took place, it was intentional.  *Id.* at 177:16–177:22.  She remembers her shirt being lifted up and people touching her in her chest area but she does not state that police officers were responsible for that activity, or that the mental image is in fact a memory of something that took place at the police station rather than elsewhere, such as at a hospital.  *See* Pl.'s Opp. at 6.  Although plaintiff's flashbacks regarding her panic while receiving her injuries indicate that she may have experienced imminent apprehension,[7] Pl.'s Opp. at 6, citing Pl.'s Dep., 95:22–97:7, she cannot attribute that fear to any act by D.C. police officers.[8]

---

[7]     *See Rogers v. Loews L'Enfant Plaza Hotel*, 526 F. Supp. 523, 529 (D.D.C. 1981) (finding that a plaintiff's fright can satisfy the imminent apprehension element).

[8]     In plaintiff's complaint, she alleged that she recalled "her hand being slammed by a police vehicle's door, lying on the ground topless and surrounded by police officers, and being aggressively manhandled."  Am. Compl. ¶ 26.  But those are merely allegations, and she has not proffered this information as facts during her sworn deposition testimony.

Plaintiff also alleges that she "suffered multiple TASER shots from Unknown Officer(s) while in Department custody," Am. Compl. ¶ 42, but she has failed to provide sufficient facts to support this allegation. The only evidence that plaintiff has provided to support this claim is her expert's opinion that the wounds on her chest and upper right arm were consistent with a TASER M-26 or a TASER X-26 or TASER X-26C in drive-stun mode. Expert Witness Rule-26 Report, Ex. 3 to Pl.'s Opp. ("Expert Report") [Dkt. # 36-3] at 6. Plaintiff surmises that she must have sustained these taser injuries – if that is what they are – while in police custody because the officer who arrested her did not notice any injuries or marks on her at the time of her arrest. Pl.'s Supplemental Opp. at 7.[9] But that logic does not necessary follow. The alleged taser marks were on plaintiff's chest, close to her heart, and on the back of her upper right arm. Am. Compl. ¶ 31. The arresting officer testified that he only saw the exposed parts of plaintiff's body. Muniz Dep., Ex. 5 to Pl.'s Opp. [Dkt. # 36-5] at 23:10–23:12. Plaintiff was arrested in the middle of the winter, so depending on what kind of shirt she was wearing at the time, the alleged taser marks may not have been visible to the arresting officer. Further, plaintiff's own expert observed in his report that the officers who worked at the police station where plaintiff was detained testified that they did not recall plaintiff, or any other detainee, complaining about being injured that day. Expert Report at 5, citing Deps. of Officer Magruder and Officer Garrison.[10]

Moreover, plaintiff has not provided any proof – not even a vague partial memory – that the police utilized an electrical stun device on her. She has no recollections of being tased by the

---

9       In his deposition, Officer Muniz, the arresting officer, testified that during the arrest, "there was no force used on her. . . . She was just transported routinely and nothing extraordinary occurred." Muniz Dep. at 15:19–16:2. He also stated that he did not recall seeing any injuries, wounds, or marks on the exposed parts of plaintiff's person. *Id.* at 10:12–10:20, 13:8–13:10, 15:14–22, 22:6–23:14, 26:18–27:1, 27:13–29:9.

10      The Court cannot independently verify the expert's statements because these transcripts were not provided to the Court.

police, she has not presented any evidence that any of the Metropolitan police who came in contact with her during her detention used or had tasers, or that there were any tasers maintained at the Second or Fourth District at all at the time she was detained.[11]

In a motion for summary judgment, the Court must accept the evidence of the non-moving party – in this case plaintiff – and draw all reasonable inferences in her favor. *Anderson*, 477 U.S. at 255. But to defeat a motion for summary judgment, the non-moving party must present some evidence for the Court's consideration, and this evidence must be sufficient to allow a jury to reasonably find for either party. *Id.* Here, plaintiff has not provided any evidence – no testimony, no hospital records, no photographs, and no medical testimony assessing her injuries – that would support her claim that D.C. police officers caused her to suffer bodily harm. Without such factual evidence, no reasonable jury could find for plaintiff on the assault and battery claims against the District, and they therefore, cannot survive summary judgment. *Acosta Orellana*, 711 F. Supp. 2d at 92 (". . . just because plaintiffs were in fact subjected to such apprehension does not alone give rise to a viable assault claim, as the plaintiffs are required to plead that the apprehension was the result of an act intended by a defendant to cause such apprehension."); *see also Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c)

---

11     MPD acquired the two tasers it currently owns in early 2012, more than two years after plaintiff's detention. *See* Dumantt Dep. at 41:17–41:21. MPD previously issued tasers to members of its ERT, but it stopped this practice at least ten years ago. *Id.* at 20:19–21:6. Plaintiff has not established, or even alleged, that she came in contact with any members of ERT during her detention, or that any ERT members that she may have encountered were carrying tasers that they had been issued more than ten years prior.

mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. . . .").[12]

B.   Counts III and IV:   Excessive force and unreasonable seizure claims against the District

The titles of Counts III and IV state that plaintiff is only asserting those claims against the unknown officers.  But the text of those counts purports to hold the District liable for excessive force and unreasonable seizure.  *See* Am. Compl. ¶ 48 ("[T]he District of Columbia[] used excessive force upon the Plaintiff); *id.* ¶ 50 ("[T]he District of Columbia[] committed unreasonable seizure upon the Plaintiff").  The Court previously dismissed Counts III and IV against the District without prejudice under Rule 12(b)(6).  Mem. Op. [Dkt. # 19] at 1.  To the extent plaintiff is attempting to reassert these claims based on her new allegations about the District's alleged taser policy, those revised claims would still fail.  As the Court has already stated, plaintiff's allegations regarding the District's taser policy do not demonstrate that her injuries were caused by a District custom or policy.  *Supra* at I(B).  Therefore, they also cannot support municipal liability claims based on the allegations in Counts III and IV.

C.   Counts II, III, and IV against the Unknown Officers

Discovery has been completed in this case.  At this point in the case, the Unknown Officers must be identified in order for the case against them to proceed.  *Simmons v. District of Columbia*, 750 F. Supp. 2d 43, 45 (D.D.C. 2011) ("Plaintiff must substitute named defendants

12      Even if plaintiff is able to prove that D.C. police officers assaulted and battered her, she is only entitled to damages for injuries that were caused by the defendants' actions.  *See Hendry v. Pelland*, 73 F.3d 397, 402 (D.C. Cir. 1996), citing Restatement (Second) of Torts § 903, cmt. a (1977), ("Compensatory damages make plaintiffs whole for the harms that they have suffered as a result of defendants' actions.").  Here, there is a complete absence of any medical opinion or any other evidence that could persuade a reasonable juror that any of the panoply of symptoms from which plaintiff suffers were caused by a taser charge or being manhandled by the police.  Plaintiff has provided no information regarding whether or how she may have been injured before the police came along, when concerned bystanders were attempting to restrain her, or what she may have done alone in a cell in a drugged state.

for those unknown defendants after the completion of discovery."); *see also Newdow v. Roberts*, 603 F.3d 1002, 1010 (D.C. Cir. 2010) (commenting that unnamed defendants are allowed "only in situations where the otherwise unavailable identity of the defendant will eventually be made known through discovery").  Since plaintiff has not identified the officers at this post-discovery stage of the case, Counts II, III, and IV against the Unknown Officers cannot stand.

## CONCLUSION

For the foregoing reasons, the Court will grant defendant's summary judgment motion on all the remaining counts against the District and the Unknown Officers.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: August 8, 2013